**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| M & N TRADING, LLC,<br><br>        Plaintiff<br><br>    v.<br><br>BOFA SECURITIES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, AND JOHN DOES 1-20,<br><br>        Defendants | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ...........................................................................................3

THE PARTIES ......................................................................................................................4

    I.     Plaintiff ...........................................................................................................4

    II.    Defendants .....................................................................................................4

FACTUAL ALLEGATIONS .................................................................................................6

    I.     Relevant Factual Background ........................................................................6

        A.    Overview of Treasury Securities ............................................... 6

        B.    Overview of Treasury Futures ................................................... 8

        C.    The Mechanics of Spoofing .................................................... 17

    II.    Evidence of Defendants' Misconduct ..........................................................21

        A.    Overview of Regulatory Settlement......................................... 21

        B.    Defendants are Active Participants in the U.S. Treasury Markets ...................... 23

        C.    Defendants' Manipulation of Treasury Futures and Treasury Securities ............ 24

        D.    Defendants' Manipulation Caused the Prices of Treasury Futures to be Artificial Throughout the Class Period ......................................... 53

        E.    The Full Scope of Defendants' Spoofing is Not Known to the Public or Otherwise Accessible to Plaintiff at This Time....................................... 54

CLASS ACTION ALLEGATIONS ......................................................................................55

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT.................................58

FIRST CLAIM FOR RELIEF ............................................................................................60

SECOND CLAIM FOR RELIEF ........................................................................................61

THIRD CLAIM FOR RELIEF ..........................................................................................63

FOURTH CLAIM FOR RELIEF ......................................................................................63

**PRAYER FOR RELIEF**............................................................................................**64**

**DEMAND FOR JURY TRIAL**..............................................................................**64**

Plaintiff M & N Trading, LLC ("Plaintiff"), complains upon knowledge, as to itself and its own actions, and upon information and belief, as to all other matters, against Defendants BofA Securities, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, and John Doe Nos. 1-20 (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.        This class action arises from Defendants' unlawful and intentional manipulation of U.S. Treasury Securities ("Treasury Securities"), Treasury futures contracts ("Treasury Futures"), and options on U.S. Treasury Futures ("Options on Treasury Futures") (together with Treasury Futures, "Treasury Futures and Options"), traded on United States-based exchanges including the Chicago Board of Trade ("CBOT")[1] during the period from at least October 2014 through February 2021 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA") and the common law.

2.        Treasury Securities are marketable debt securities—sold in the form of bills, notes, bonds, and other instruments—issued by the United States government that earn interest through their maturity date, at which time the "par" amount (equal to the principal) is returned to the owner. Treasury Futures are standardized agreements to buy or sell Treasury Securities, at a specified date in the future.

3.        On November 29, 2023, Defendant BofA Securities, Inc. ("BofAS") submitted a letter of acceptance, waiver, and consent to the Financial Industry Regulatory Authority ("FINRA") agreeing to pay a $24 million fine in connection with the "fraudulent trading" of two

---

[1] CBOT is a designated contract market that is, and was at all relevant times, owned and operated by CME Group, Inc.

former BofAS employees, one of whom was a supervisor and desk head, from October 2014 through February 2021 in the markets for Treasury Futures and Treasury Securities.[2]

4.      Defendants manipulated the prices of Treasury Futures using a classic manipulative device known as "spoofing," whereby Defendants placed illegitimate orders for Treasury Securities or Treasury Futures, which orders Defendants intended to cancel prior to execution at the time those orders were placed. Defendants placed these illegitimate orders to send false and illegitimate supply and demand signals to the market and create artificial prices. As a result of their manipulation, Defendants caused Treasury Futures and Treasury Securities prices to be artificial throughout the Class Period to illegitimately benefit themselves financially, at the expense of other investors, including Plaintiff and the Class.

5.      During the Class Period, Defendants engaged in at least hundreds of manipulative acts and successfully manipulated the prices of Treasury Futures and Treasury Securities, causing artificial prices and harm to other market participants.

6.      Throughout the Class Period, Defendants systemically failed to supervise their traders. FINRA described BofAS's compliance system as "not reasonably designed to achieve compliance with securities laws and regulations and FINRA rules prohibiting spoofing."[3]

7.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint, including the full scope of Defendants' illegitimate, manipulative trades, will be uncovered through discovery.

---

[2] Letter of Acceptance, Waiver, and Consent from FINRA to Bank of America Securities ("BofAS AWC Letter"), Letter No. 2019063152203, available at: https://www.finra.org/sites/default/files/2023-11/BofA-AWC-2019063152203-113023.pdf.

[3] BofAS AWC Letter at 6.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because this action arises under Section 22 of the CEA, 7 U.S.C. § 25. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

9.      Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391(b), (c), and (d), and Section 22 of the CEA, 7 U.S.C. § 25(c). One or more of the Defendants resided, transacted business, were found, or had agents in the District during the Class Period.

10.      Chicago is the global center of futures and options trading, a major hub of the Treasury Futures trading activity at issue in this litigation, and the location of key witnesses and documents. For example, the Northern District of Illinois is home to the Chicago Board of Trade, owned by CME Group Inc., which hosts the Treasury Futures trading at issue in this litigation, and Globex, the electronic trading system through which the trades at issue were made, utilizes servers located in and around Chicago. A significant part of the events giving rise to the claims occurred in the Northern District of Illinois.

11.      Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint. Treasury Futures are commodities that trade in interstate commerce in the United States.

## THE PARTIES

### I.    Plaintiff

12.    Plaintiff M & N Trading, LLC ("Plaintiff") was at all relevant times an Illinois limited liability company. Plaintiff transacted in thousands of Treasury Futures and Options during the Class Period, including purchases and sales of futures on the CBOT, and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for CBOT Treasury Futures throughout the Class Period, including on days that Plaintiff traded, which deprived Plaintiff of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff and the Class to pay more to purchase, or receive less to sell, CBOT Treasury Futures. These artificial prices caused Plaintiff to earn less profits or suffer greater losses in its trading of CBOT Treasury Futures during the Class Period. Specific examples of days on which Plaintiff traded in the same instrument that Defendants manipulated, in the opposite direction of the manipulation (*i.e.*, sold when prices were manipulated lower, or bought when prices were manipulated higher), and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation are detailed in Section II.C., *infra*.

### II.    Defendants

13.    Defendant BofA Securities, Inc. ("BofAS") is a full-service broker-dealer providing a range of financial services including sales and trading, market making, investment banking, and underwriting. BofAS is a member firm of FINRA and has approximately 5,400

registered representatives across nearly 150 branch offices, including in Chicago. BofAS is wholly-owned by Bank of America Corporation.[4]

14.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") is a registered broker-dealer and investment adviser with the United States Securities and Exchange Commission, a member firm of FINRA, and is registered as an introducing broker with the United States Commodity Futures Trading Commission ("CFTC"). In May 2019, Merrill Lynch's investment banking and trading divisions were reorganized as BofA Securities, Inc.

15.     Defendants John Doe Nos. 1-20 are persons and entities employed by or affiliated with BofAS, Merrill Lynch, or others that directly or indirectly inappropriately manipulated or attempted to manipulate the trading and prices of Treasury Futures and Treasury Securities. The defined term "Defendants" includes BofAS, Merrill Lynch, and these John Doe Defendants.

16.     During the Class Period, Defendants' subsidiaries or other affiliates or employees of Defendants joined and furthered the manipulation of Treasury Futures and Treasury Securities, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

17.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

---

[4] Bank of America Corporation: Select Subsidiaries (Jan. 12, 2024), available at: https://investor.bankofamerica.com/fixed-income/corporate-structure.

18.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

I.    **Relevant Factual Background**

A.    **Overview of Treasury Securities**

19.     **U.S. Treasury Securities**. The U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions. This debt is subject to fixed terms, *e.g.*, 2-year, 5-year, 10-year, and 30-year terms, at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds. Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in the secondary cash market at prevailing prices from dealers in government securities. Many instruments bought and sold by market participants are also linked to Treasury yields/prices. As of October 31, 2023, there were more than $25.9 trillion in U.S. Treasury Securities outstanding.[5]

20.     After Treasury Securities are auctioned, investors can buy and sell these securities over-the-counter in the secondary (or "cash") market on various trading platforms.

21.     **U.S. Treasury Notes**. U.S. Treasury notes ("T-Notes") are Treasury Securities with maturities between 1-year to 10-years and are issued with maturities of two (2), three (3), five (5), seven (7), and ten (10) years. T-Note interest is paid semiannually, and the principal is paid upon maturity.

---

[5] *U.S. Treasury Monthly Statement of the Public Debt*, DEP'T OF TREASURY, BUREAU OF THE FISCAL SERV. (Oct. 31, 2023), https://fiscaldata.treasury.gov/datasets/monthly-statement-public-debt/summary-of-treasury-securities-outstanding.

22.     **U.S. Treasury Bonds**. U.S. Treasury bonds ("T-Bonds") are Treasury Securities with maturities of greater than ten (10) years at time of issuance. T-Bond interest is paid semiannually, and the principal is paid upon maturity.

23.     T-Notes and T-Bonds are priced based on their par value, the public demand for the debt, prevailing interest rate yields, and coupon rate. The par value is the face value of the T-Note or T-Bond. The coupon rate is the annual interest rate, as a percentage of par value, paid on a T-Note or T-Bond as determined by the U.S. Treasury Department. For example, a $1,000,000 T-Note with a coupon rate of 3% will pay $30,000 a year total, paid as two $15,000 semiannual payments.

24.     The secondary cash market for Treasury Securities utilizes an electronic order book that displays quantities of orders or offers to sell Treasury Securities and bids to buy Treasury Securities at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

25.     Quotes to buy or sell are entered into the order book, which allows market participants to see the visible number of orders and the visible total number of contracts that all traders are actively bidding or offering at a given price level.

26.     Market participants in the secondary cash market for Treasury Securities view the aggregate resting bids and offers for Treasury Securities and Treasury Futures. Traders use the information contained in the order book to make trading decisions, including considering the "balance" between the displayed bid and offer quantities on both sides of the market.

27.     To illustrate, if the order book for 30-Year T-Bonds is imbalanced with significantly more displayed quantity for the best-bid level compared to the best-ask level, then market participants may reasonably believe that there is more demand to purchase 30-Year T-Bonds than supply and that prices for 30-Year T-Bonds, and the corresponding Ultra T-Bond Futures contract, will increase.

28.     Similar to Treasury Futures, market participants in the secondary cash market for Treasury Securities can fully display the quantity of their respective orders or display only a portion of the order, which is known as an "iceberg" order. Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity. The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg," given the greater number of limit orders ready to be placed.

### B.     Overview of Treasury Futures

#### 1.     Overview of Key Terms

29.     **Commodity Futures Contract**. A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price and time in the future. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based. The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index. Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets, such as the CBOT, specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

30.     **"Long" and "Short" Futures**. Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future. Treasury Futures are deliverable upon expiry. However, futures contracts can also be offset before expiration.

31.     **Offset by Trading**. Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs. For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of another contract. The difference between the initial purchase price and the sale price represents the trader's realized profit or loss.

32.     **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury Futures).

33.     **Call Option**. A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

34.     **Put Options**. A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay at or above the strike price of the put option so that the seller of the option would not be forced to buy the underlying futures contract at an above-market price.

35.     **U.S. Treasury Futures**. Treasury Futures are deliverable baskets of U.S. Treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[6] Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

36.     Treasury Securities are the commodities underlying Treasury Futures. There is, therefore, a direct relationship between Treasury Securities and Treasury Futures contracts such that manipulation in the Treasury Securities cash market directly impacts Treasury Futures prices.

37.     Since the first Treasury Futures products were launched over forty (40) years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts are still traded through open outcry. During the Class Period, U.S. Treasury Futures traded on the CBOT included, among others: (i) 2-year T-Note Futures; (ii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond Futures; (v) Ultra 10-year T-Note Futures; and (vi) Ultra U.S. Treasury Bond Futures (the "Ultra T-Bond"). Options are generally available on U.S. Treasury

---

[6] As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options on CBOT Treasury Futures contracts, unless otherwise noted.

Futures contracts. Treasury Futures contracts have two (2) sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.

38.     The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges. The CME Group's global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In 2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a Designated Contract Market offering products subject to CBOT rules and regulations. CBOT brought a suite of interest rate, agricultural, and equity index products to CME Group's existing offerings. Today, the CME Group is made up of at least four (4) exchanges: CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes.

39.     The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts on CME exchanges. Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day. CME Globex is subject to CME rules, including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions, including but not limited to exclusion from trading.

40.     CME Globex utilizes an electronic "order book" that displays quantities of anonymous orders at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

41.     Orders to buy or sell are entered into the order book, which allows market participants to see the visible number of orders and the visible total number of contracts that all traders are actively bidding or offering at a given price level. The identities of traders who submit orders into the order book are anonymous. Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

42.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book and represents the visible market depth. An illustrative example of a visible order book is contained in FIGURE 1. Traders use the information contained in the order book to make trading decisions.



**FIGURE 1.**

43.     An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact. Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower. Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

44.     By contrast, a "passive order" does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-bid price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. A passive sell order would be placed at the best-offer/ask price or higher. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

45.     CME Globex bids and offers for outright futures are matched according to an algorithm on a first-in, first-out ("FIFO") basis. Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority. Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size. Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

### 2.     2-year T-Note Futures

46.     A 2-year T-Note Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[7] The commodity underlying 2-year T-Note Future contracts is U.S. Treasury Notes with an original term to maturity of not more than five (5) years and three (3) months, a

---

[7] *See* 2-year T-Note Futures, CBOT Rulebook, Ch. 21, https://www.cmegroup.com/rulebook/CBOT/II/21.pdf.

remaining term to maturity of not less than one (1) year and nine (9) months from the first day of the delivery month, and a remaining term to maturity of not more than two (2) years from the last day of the delivery month.

47.    The 2-year T-Note Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. 2-year T-Note Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

48.    Each contract represents Treasury Securities with a face value of $200,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the minimum price fluctuation, or "tick," is 0.00390625 points, which equates to $7.8125 per futures contract.

### 3.    5-year T-Note Futures

49.    A 5-year T-Note Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[8] The commodity underlying this futures contract is U.S. Treasury Notes with an original term to maturity of not more than five (5) years and three (3) months and a remaining term to maturity of not less than four (4) years and two (2) months as of the first day of the delivery month.

50.    The 5-year T-Note Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. 5-year T-Note Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

51.    Each contract represents Treasury Securities with a face value of $100,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the

---

[8] *See* 5-year T-Note Futures, CBOT Rulebook, Ch. 20, https://www.cmegroup.com/rulebook/CBOT/II/20.pdf.

minimum price fluctuation, or "tick," is 0.0078125 points, which equates to $7.8125 per futures contract.

### 4. 10-year T-Note Futures

52.     A 10-year T-Note Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[9] The commodity underlying this futures contract is U.S. Treasury notes, with a remaining term to maturity of at least six (6) and a half years, but not more than ten (10) years, from the first day of the delivery month.

53.     The 10-year T-Note Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. 10-year T-Note Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

54.     Each contract represents Treasury Securities with a face value of $100,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the minimum price fluctuation, or "tick," is 0.015625 points, which equates to $15.625 per futures contract.

### 5. Ultra 10-year T-Note Futures

55.     An Ultra 10-year T-Note Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[10] The commodity underlying this futures contract is U.S. Treasury notes, with a remaining term to maturity of at least nine (9) years and five (5) months, but not more than ten (10) years, from the first day of the delivery month.

---

[9] *See* 10-year T-Note Futures, CBOT Rulebook, Ch. 19, https://www.cmegroup.com/rulebook/CBOT/II/19.pdf.

[10] *See* Ultra 10-year T-Note Futures, CBOT Rulebook, Ch. 26, https://www.cmegroup.com/markets/interest-rates/us-treasury/ultra-10-year-us-treasury-note.contractSpecs.html.

56.     The Ultra 10-year T-Note Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. Ultra 10-year T-Note Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

57.     Each contract represents Treasury Securities with a face value of $100,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the minimum price fluctuation, or "tick," is 0.015625 points, which equates to $15.625 per futures contract.

### 6.     U.S. Treasury Bond Futures

58.     A U.S. Treasury Bond Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[11] The commodity underlying this futures contract is U.S. Treasury Bonds with a remaining term to maturity of at least fifteen (15) years and less than twenty-five (25) years from the first day of the futures delivery month.

59.     U.S. Treasury Bond Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. U.S. Treasury Bond Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

60.     Each contract represents Treasury Securities with a face value of $100,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the minimum price fluctuation, or "tick," is 0.03125 points, which equates to $31.25 per futures contract.

---

[11] *See* U.S. Treasury Bond Futures, CBOT Rulebook, Ch. 18, https://www.cmegroup.com/rulebook/CBOT/II/18.pdf.

### 7. Ultra U.S. Treasury Bond Futures

61.     An Ultra U.S. Treasury Bond ("Ultra T-Bond") Future is a futures contract traded on the CBOT and subject to the rules of the CBOT.[12] The commodity underlying this futures contract is U.S. Treasury Bonds with a remaining term to maturity of not less than twenty-five (25) years from the first day of the futures contract delivery month.

62.     Ultra T-Bond Futures contracts are exchange-listed financial instruments that are traded electronically on CME's Globex platform. Ultra T-Bond Futures are deliverable futures contracts meaning that they are settled through delivery of the underlying commodity.

63.     Each contract represents Treasury Securities with a face value of $100,000 at maturity. The price is quoted in points (with par value represented by 100 points), and the minimum price fluctuation, or "tick," is 0.03125 points, which equates to $31.25 per futures contract.

### C. The Mechanics of Spoofing

64.     The market for Treasury Futures contracts and Treasury Securities is susceptible to manipulation. "Spoofing" is a manipulative trading tactic that causes artificial prices in markets. Specifically, the practice entails submitting bids or offers with the intent to cancel those bids or offers at the time they are placed, but before the bid or offer is executed. Rather than reflecting legitimate supply and demand, these spoof orders are entered with the intent to cause artificial prices by creating the illegitimate impression of increased supply or demand in the market.

65.     Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices. For example, if a trader wants to buy at an artificially lower

---

[12] *See* Ultra U.S. Treasury Bond Futures, CBOT Rulebook, Ch. 40, https://www.cmegroup.com/rulebook/CBOT/III/40.pdf.

price, he may place an order, sometimes in the form of an iceberg order, to buy Treasury Futures contracts or Treasury Securities at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell. The trader will then spoof prices lower by placing one or more large orders—orders the trader never intends to execute—to *sell* a substantial amount on the opposite side. These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled. These large orders falsely signal that investors are selling their Treasury Futures contracts or Treasury Securities, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order. The manipulator cancels the large spoof orders before they get filled, so the trader never enters a transaction at that price level. Alternatively, the manipulator can first enter spoof orders to trigger other market participants to enter passive orders at a desired price, and the manipulator will enter a primary aggressive order to execute at that desired price.

66. FIGURES 2A and 2B below show the order book imbalance that spoofing causes. FIGURE 2A is a hypothetical order book. The best bid is two (2) ticks away from the best offer and, therefore, no executable trades are present. For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid. FIGURE 2B shows the same hypothetical order book after a series of orders have been entered, namely, an iceberg buy order that has been placed to buy twenty (20) contracts, but only shows two (2) contracts to the market at a time. Then, one spoof order is placed on the opposite side of the market for 100 contracts at the first offer level. Following these spoof orders, the order book shows a significant

imbalance, giving the appearance of more sellers in the market than buyers, which signals artificial

supply to market participants and leads to artificial, downward price pressure.

| Order Book Before the Spoofing Begins | | | | |
|---|---|---|---|---|
| Price / Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104.5 | | | 6 | 20 |
| 104 | | | 11 | 100 |
| 103.5 | | | 8 | 50 |
| 103 | | | 3 | 20 |
| 102.5 | | | 5 | 25 |
| 102 | | | 6 | 30 |
| | | | | |
| 101 | 6 | 50 | | |
| 100.5 | 10 | 20 | | |
| 100 | 14 | 100 | | |
| 99.5 | 8 | 25 | | |
| 99 | 6 | 25 | | |
| 98.5 | 12 | 30 | | |
| 98 | 4 | 50 | | |
| 97.5 | 7 | 40 | | |
| 97 | 5 | 20 | | |
| 96.5 | 7 | 15 | | |
| TOTAL: | 79 | 375 | 84 | 370 |

**FIGURE 2A.**



**FIGURE 2B.**

67.     The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell Treasury Futures contracts or Treasury Securities at well above the current market prices and then, by entering and canceling large orders to buy the same futures contract or Treasury Securities, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of the trader's initial sell order.

68.     In each instance, the trader profits because spoofing allows the trader to buy Treasury Futures contracts or Treasury Securities below the current market price or sell Treasury Futures contracts or Treasury Securities above the current market price.

20

69.     The CFTC has described spoofing as "a particularly pernicious example of bad actors seeking to manipulate the market through the abuse of technology."[13] James McDonald, the CFTC's former Director of Enforcement, remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available to the market, reduced friction in trading, and significantly enhanced the price discovery process. But at the same time, this technological development has presented new opportunities for bad actors. Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the electronic order book could trick them into trading to benefit a bad actor.[14]

70.     Traders spoof to gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims. As alleged here, Defendants' use of spoofing and other manipulative conduct harmed Plaintiff and the Class members who purchased or sold Treasury Futures and Options at artificial prices during the Class Period.

## II.     Evidence of Defendants' Misconduct

### A.     Overview of Regulatory Settlement

71.     On November 29, 2023, Defendant BofAS submitted a letter of acceptance, waiver, and consent paying a $24 million fine in connection with the "fraudulent trading" of two former traders between October 2014 through February 2021.[15] Specifically, the two traders defrauded

---

[13] *See* Press Release, *Statement of CFTC Director of Enforcement James McDonald*, CFTC (Jan. 29, 2018), available at: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonald statement012918.

[14] *See* Annual Report of the Division of Enforcement, CFTC, at 5 (Nov. 14, 2018), available at: https://www.cftc.gov/sites/default/files/2018-11/ENFAnnualReport111418_0.pdf.

[15] BofAS AWC Letter.

other market participants by way of a consistent pattern of manipulative conduct, including at least hundreds of episodes of spoofing the markets for Treasury Futures and Treasury Securities.[16]

72.     FINRA further found that BofAS failed to reasonably monitor for spoofing in the U.S. Treasury markets, noting that BofAS failed to establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules.[17] FINRA noted the following:

a.     "From at least October 2014 through September 2022, BofAS's written policies and procedures prohibited spoofing, but its supervisory system was not reasonably designed to achieve compliance with securities laws and regulations and FINRA rules prohibiting spoofing for several reasons."[18]

b.     "[P]rior to November 2015, BofAS did not conduct any surveillance or supervisory reviews for spoofing in the U.S. Treasury markets."[19]

c.     "[U]ntil mid-2019, BofAS surveilled only for spoofing by trading algorithms, not manual spoofing by its traders, in U.S. Treasury securities. BofAS designed its sole spoofing report to detect only algorithmic spoofing by setting an order cancellation threshold of 250 milliseconds or less. The cancellation threshold was too narrow to capture any of the 717 instances of manual spoofing here."[20]

---

[16] *Id.* at 4.

[17] *Id.* at 6-7.

[18] *Id.* at 6.

[19] *Id.* at 7.

[20] *Id.*

d.     "[T]hrough at least December 2020, BofAS did not surveil for potential U.S. Treasury spoofing through orders its traders entered into up to eight trading systems provided by external venues. BofAS's surveillance was limited to potential spoofing orders entered into its proprietary order routing system, even though its traders could directly enter and cancel U.S. Treasury orders into up to eight other systems."[21]

e.     "[P]rior to October 2022, BofAS did not conduct any surveillance or supervisory reviews for potential cross-product spoofing in the U.S. Treasury markets."[22]

73.     During the Class Period, Defendants systemically failed to supervise their traders, which enabled Defendants to promote and maintain a continuous culture of manipulation that pervaded Defendants' Treasury markets desks.

**B.     Defendants are Active Participants in the U.S. Treasury Markets**

74.     Throughout the entire Class Period, BofAS was a market maker for both U.S. Treasury Securities and Treasury Futures.[23]

75.     Defendants' employees utilized the electronic trading system Pioneer, which is BofAS's proprietary order routing system to view quantities available, prices, and place orders for Treasury Securities and Treasury Futures. BofAS's Pioneer system allowed its traders to manually place orders, either fully displayed or partially displayed as an iceberg order, and cancel orders.[24]

---

[21] *Id.*

[22] *Id.*

[23] *Id.* at 3.

[24] FINRA Complaint ("FINRA Complaint") at 6, *Department of Enforcement v. Sidney Lebental, CRD No. 5543658*, FINANCIAL INDUSTRY REGULATORY AUTHORITY OFFICE OF HEARING OFFICERS, Disciplinary Proceeding No. 2019063152202 (May 23, 2023), available at: https://www.

76.    Defendants actively trade Treasury Futures and Treasury Securities, among other financial products.

77.    Upon information and belief, Mr. Lebental is the supervisor noted in FINRA's Letter of Acceptance, Waiver, and Consent, dated November 29, 2023.

78.    Mr. Lebental was the head of Merrill Lynch's U.S. Treasury desk from approximately October 2014 until 2018, and supervised the Merrill Lynch traders on that desk.[25] In 2018, Mr. Lebental was promoted to head of Americas Linear Rates at BofAS. Lebental had similar responsibility for BofAS when Merrill Lynch's investment banking and trading divisions were reorganized in May 2019.[26] In that role, Lebental oversaw multiple desks, including the U.S. Treasury desk, and managed a trading book valued at approximately $15 billion to $20 billion.[27]

79.    Defendants also employed other supervisors, salespersons, and traders who traded Treasury Futures and Treasury Securities across the globe, including in offices in the United States.

**C.    Defendants' Manipulation of Treasury Futures and Treasury Securities**

80.    During the Class Period, Defendants and their traders manipulated the prices of Treasury Futures and Treasury Securities to illegally increase their trading profits at the expense of Plaintiff and the Class. Specifically, Defendants manipulated the prices of Treasury Futures by placing hundreds of manipulative spoof orders in corresponding Treasury Securities and Treasury Futures that Defendants never intended to execute, with the intent to create the false and misleading

---

finra.org/sites/default/files/fda_documents/2019063152202%20Sidney%20Lebental%20CRD%2 05543658%20Complaint%20vr%20%282023-1687479613017%29.pdf.

[25] FINRA Complaint at 5-6.

[26] Ben Mattlin, *FINRA Alleges Former Merrill Bond Trader Engaged in Fraud*, FINANCIAL ADVISOR (May 25, 2023), available at: https://www.fa-mag.com/news/finra-takes-disciplinary-action-against-nyc-bond-trader-73324.html.

[27] FINRA Complaint at 6.

impression of increased supply and demand in order to: (i) cause artificial prices in the Treasury Futures market as a result of their illegitimate trading; and (ii) financially benefit Defendants at the expense of Plaintiff and the Class.

81. On at least hundreds of occasions, Defendants knowingly and intentionally placed orders to buy and sell Treasury Futures and Treasury Securities with the intent to cancel those orders before execution.

82. Defendants placed manipulative spoof orders to cause artificial Treasury Futures prices and move prices in a direction that did not accurately reflect market-based forces of supply and demand.

83. By placing manipulative spoof orders to *buy* Treasury Futures and Treasury Securities, Defendants intended to falsely signal to the U.S. Treasury markets that there was increased demand, thus artificially driving up the prices of Treasury Futures and Treasury Securities.

84. Conversely, by placing manipulative spoof orders to *sell* Treasury Futures and Treasury Securities, Defendants intended to falsely signal to the U.S. Treasury markets that there was an increased supply, thus artificially driving down the prices of Treasury Futures and Treasury Securities.

85. Market participants traded in U.S. Treasury markets that appeared, and they believed, to be subject to a legitimate change in supply or demand. As a result, Defendants' manipulation caused market participants to enter sell orders below, or buy orders above, a competitive market price. Likewise, other market participants kept positions below or above what would have otherwise been the prevailing market price and quantity.

86. Defendants' manipulative spoof orders allowed Defendants to buy or sell Treasury Futures and Treasury Securities from/to other market participants at artificially higher or lower prices than would have existed if not for the manipulative spoof orders.

87. Defendants' manipulation was disclosed for the first time in the FINRA Letter of Acceptance, Waiver, and Consent on November 29, 2023.

88. During the Class Period, Defendants' manipulation caused millions of dollars in losses to market participants in the market for Treasury Futures and Treasury Securities. Specific representative examples include the following:

### 1. November 18, 2014

89. On November 18, 2014, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 99.140625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

90. As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, November 18, 2014, Plaintiff bought ten (10) Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result

of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 2. December 26, 2014

91.     On December 26, 2014, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of twenty (20) Ultra T-Bond Futures contracts, which had a par value of $2 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $25 million par value of the U.S. 30-year Treasury bonds at the price of 103.84375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

92.     As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, December 26, 2014, Plaintiff bought seventeen (17) Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 3. January 8, 2015

93.     On January 8, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of

the U.S. 30-year Treasury bonds at the price of 108.34375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

94.     As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, January 8, 2015, Plaintiff bought ten (10) Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 4.      January 12, 2015

95.     On January 12, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 110.546875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

96.     As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, January 12, 2015, Plaintiff bought three (3) Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 5.     January 26, 2015

97.     On January 26, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 113.375. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

98.     As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, January 26, 2015, Plaintiff sold 138 Ultra T-Bond Futures contracts at artificially low prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff received less when selling Ultra T-Bond Futures contracts and did so at artificially low prices as a direct result of

Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 6. March 5, 2015

99. On March 5, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 95.609375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

100. As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, March 5, 2015, Plaintiff bought twenty-four (24) Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 7. March 16, 2015

101. On March 16, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of

the U.S. 30-year Treasury bonds at the price of 96.78125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

102.    As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, March 16, 2015, Plaintiff sold forty-seven (47) Ultra T-Bond Futures contracts at artificially low prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff received less when selling Ultra T-Bond Futures contracts and did so at artificially low prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

**8.    May 5, 2015**

103.    On May 5, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 91.8125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

104.    As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, May 5, 2015, Plaintiff sold thirty-seven (37) Ultra T-Bond Futures contracts at artificially low prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff received less when selling Ultra T-Bond Futures contracts and did so at artificially low prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 9.    June 1, 2015

105.    On June 1, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an order to sell a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 102.265625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's order to sell was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

106.    As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, June 1, 2015, Plaintiff bought 250 Ultra T-Bond Futures contracts at artificially high prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff paid more when buying Ultra T-Bond Futures contracts and did so at artificially high prices as a direct result of Defendants'

manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 10.   July 1, 2015

107.   On July 1, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 96.140625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

108.   As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. For example, on this same day, July 1, 2015, Plaintiff sold thirty-one (31) Ultra T-Bond Futures contracts at artificially low prices directly caused by Defendants' manipulation. As a result of Defendants' manipulative spoofing, Plaintiff received less when selling Ultra T-Bond Futures contracts and did so at artificially low prices as a direct result of Defendants' manipulation. These artificial prices caused Plaintiff to earn fewer profits or suffer greater losses in its trading of Ultra T-Bond Futures contracts during the Class Period.

### 11.   October 21, 2015

109.   On October 21, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $100 million par value

of the U.S. 30-year Treasury bonds at the price of 100.140625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

110.    Similarly, on this same day, Sidney Lebental placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 100.140625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 12.    October 29, 2015

111.    On October 29, 2015, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 98.625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having

successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 13.     March 7, 2016

112.     On March 7, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 107 Ultra T-Bond Futures contracts, which had a par value of $10.70 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 95.53125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 14.     April 22, 2016

113.     On April 22, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 95.9375. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 15. May 17, 2016

114.    On May 17, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of seventy-five (75) Ultra T-Bond Futures contracts, which had a par value of $7.50 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 98.390625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

115.    Similarly, on May 17, 2016, Sidney Lebental placed an iceberg order to buy a total of seventy-five (75) Ultra T-Bond Futures contracts, which had a par value of $7.50 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $25 million par value of the U.S. 30-year Treasury bonds at the price of 98.390625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

116.    Also, on May 17, 2016, Sidney Lebental placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $75 million par value of the U.S. 30-year Treasury bonds at the price of 98.203125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts,

including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

117.    Lastly, on May 17, 2016, Sidney Lebental placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 98.203125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 16.    June 20, 2016

118.    On June 20, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 100.328125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 17. July 27, 2016

119.     On July 27, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 105.375. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 18. July 29, 2016

120.     On July 29, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 106.234375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 19. September 13, 2016

121.     On September 13, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $100 million par value of

the U.S. 30-year Treasury bonds at the price of 95.359375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

122. Similarly, on September 13, 2016, Sidney Lebental, placed an iceberg order to sell a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $100 million par value of the U.S. 30-year Treasury bonds at the price of 95.4375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 20. September 26, 2016

123. On September 26, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 98.609375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures

contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 21.     October 13, 2016

124.     On October 13, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $100 million par value of the U.S. 30-year Treasury bonds at the price of 95.125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 22.     November 9, 2016

125.     On November 9, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 89.53125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 23. November 14, 2016

126. On November 14, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 97.6875. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 24. December 2, 2016

127. On December 2, 2016, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 96.609375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 25. March 3, 2017

128. On March 3, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $100 million par value of

the U.S. 30-year Treasury bonds at the price of 98.171875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 26.     March 8, 2017

129.    On March 8, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 96.953125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 27.     May 19, 2017

130.    On May 19, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 340 Ultra T-Bond Futures contracts, which had a par value of $34 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 101.875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts

was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 28. June 20, 2017

131. On June 20, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $75 million par value of the U.S. 30-year Treasury bonds at the price of 105.28125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 29. June 29, 2017

132. On June 29, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $100 million par value of the U.S. 30-year Treasury bonds at the price of 103.34375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

133. Similarly, on June 29, 2017, Sidney Lebental placed an order to sell a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed

a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 103.328125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 30.    July 25, 2017

134.    On July 25, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 150 Ultra T-Bond Futures contracts, which had a par value of $15 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 102.8125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 31.    November 17, 2017

135.    On November 17, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 98.875. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after

placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 32.    November 22, 2017

136.    On November 22, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 99.828125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 33.    November 29, 2017

137.    On November 29, 2017, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to buy a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $25 million par value of the U.S. 30-year Treasury bonds at the price of 98.671875. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 34.        March 6, 2018

138.    On March 6, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. 30-year Treasury bonds at the price of 97.359375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 35.        August 28, 2018

139.    On August 28, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 99.390625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 36.        October 2, 2018

140.    On October 2, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 300 Ultra T-Bond Futures contracts, which had a par value of $30 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of

the U.S. 30-year Treasury bonds at the price of 95.921875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 37. November 29, 2018

141.     On November 29, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 300 Ultra T-Bond Futures contracts, which had a par value of $30 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 100.875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 38. November 30, 2018

142.     On November 30, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 101.0625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures

contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 39.    December 4, 2018

143.    On December 4, 2018, Sidney Lebental, while employed at Merrill Lynch, placed an iceberg order to sell a total of 350 Ultra T-Bond Futures contracts, which had a par value of $35 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $75 million par value of the U.S. 30-year Treasury bonds at the price of 103.890625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

144.    Similarly, on December 4, 2018, Lebental placed an iceberg order to sell a total of 350 Ultra T-Bond Futures contracts, which had a par value of $35 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $60 million par value of the U.S. 30-year Treasury bonds at the price of 103.890625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 40.    January 10, 2019

145.    On January 10, 2019, Sidney Lebental placed an iceberg order to buy a total of 300 Ultra T-Bond Futures contracts, which had a par value of $30 million. Then, Mr. Lebental placed

a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 106.78125. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 41. October 9, 2019

146.    On October 9, 2019, Sidney Lebental placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. Treasury bonds at the price of 103.6875. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

147.    Similarly, on October 9, 2019, Sidney Lebental also placed three (3) separate iceberg order to each sell 100 Ultra T-Bond Futures contracts, which each had a par value of $10 million. Following each iceberg order, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. Treasury bonds at the price of 103.75. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell

Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

148.     Likewise, on October 9, 2019, Sidney Lebental placed two (2) iceberg order to sell a total of 200 Ultra T-Bond Futures contracts, which had a par value of $20 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. Treasury bonds at the price of 103.75. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 42.     November 12, 2019

149.     On November 12, 2019, Sidney Lebental placed an iceberg order to sell a total of 300 Ultra T-Bond Futures contracts, which had a par value of $30 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy $50 million par value of the U.S. Treasury bonds at the price of 99.125. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 43.     January 23, 2020

150.    On January 23, 2020, Sidney Lebental, while employed at BofAS, placed an iceberg order to buy a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 104.390625. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

151.    Similarly, on January 23, 2020, Mr. Lebental placed two (2) iceberg orders to buy a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell a total of $75 million par value of the U.S. 30-year Treasury bonds at the price of 104.375. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg orders to buy were filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

152.    Lastly, on January 23, 2020, Mr. Lebental placed two (2) iceberg orders to buy a total of 250 Ultra T-Bond Futures contracts, which had a par value of $25 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell a total of $50 million par value of the U.S. 30-year Treasury bonds at the price of 104.375. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury

Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg orders to buy were filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 44. April 7, 2020

153. On April 7, 2020, Sidney Lebental, while employed at BofAS, placed an iceberg order to buy a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to sell $50 million par value of the U.S. 30-year Treasury bonds at the price of 116.96875. Mr. Lebental's manipulative Spoof Order signaled supply for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, lower. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to buy was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

### 45. May 7, 2020

154. On May 7, 2020, Sidney Lebental, while employed at BofAS, placed an iceberg order to sell a total of fifty (50) Ultra T-Bond Futures contracts, which had a par value of $5 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy a total of $50 million par value of the U.S. 30-year Treasury bonds at the price of 114.609375. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

**46.    February 9, 2021**

155.    On February 9, 2021, Sidney Lebental, while employed at BofAS, placed an iceberg order to sell a total of 100 Ultra T-Bond Futures contracts, which had a par value of $10 million. Then, Mr. Lebental placed a manipulative Spoof Order to buy a total of $50 million par value of the U.S. 30-year Treasury bonds at the price of 93.0625. Mr. Lebental's manipulative Spoof Order signaled demand for U.S. 30-year Treasury bonds, which artificially moved the market price of Treasury Futures contracts, including Ultra T-Bond Futures contracts, higher. Shortly after placing the manipulative Spoof Order, Mr. Lebental's iceberg order to sell Ultra T-Bond Futures contracts was filled. Having successfully manipulated the price of Ultra T-Bond Futures contracts in Merrill Lynch's favor, Mr. Lebental canceled his manipulative Spoof Order.

156.    In each of the above illustrative examples, Defendants successfully manipulated the U.S. Treasury markets to illegitimately increase their trading profits, at the expense of Plaintiff and the Class. As a result of Defendants' unlawful manipulation, Plaintiff and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.

### D.    Defendants' Manipulation Caused the Prices of Treasury Futures to be Artificial Throughout the Class Period

157.    Spoofing impacts prices, which is why Defendants regularly engaged in this manipulation to cause artificial prices that benefitted Defendants' trading business.

158.    Defendants' spoofing had a lasting impact on the market for Treasury Futures well beyond the time the manipulative spoof orders were placed. Frequently, Defendants' spoofing resulted in their other illegitimate, non-spoof orders getting filled at artificially higher or lower prices, which artificial prices were the intended and actual result of Defendants' manipulation. These other illegitimate, executed transactions that occurred at artificial prices, which artificial

prices were the result of Defendants' manipulative spoof orders, had a lasting impact on the market for Treasury Futures, even after Defendants' manipulative spoof orders themselves were canceled.[28] Defendants' constant flow of manipulative orders and artificial supply and demand signals rendered prices artificial throughout the Class Period, not merely during any one particular instance of manipulation.

### E. The Full Scope of Defendants' Spoofing is Not Known to the Public or Otherwise Accessible to Plaintiff at This Time

159.    Plaintiff cannot, at this time, know the full time period or scope of Defendants' spoofing, nor can Plaintiff know all of the traders, trading desks, and offices involved in Defendants' manipulative spoofing scheme.

160.    Electronic trading from distant computers makes spoofing possible and easily concealable from other market participants. The "anonymous nature of commodities trading" prevents traders from independently testifying as to the identity of the counterparty in each of their losing transactions or the identity of the manipulator.[29]

161.    Historically, trading was conducted in person in "open-outcry" trading pits. In such environments, a manipulator would be readily identifiable. The manipulator would verbalize or hand signal orders and then, when the other pit traders noticed, the manipulator would withdraw the hand signal or pretend like the order was never communicated. If this process repeated itself, the other traders in the pit would get wise and either ignore the manipulator or lodge a complaint with the exchange.

---

[28] *See generally* Zoltán Eisler, Jean-Philippe Bouchaud & Julien Kockelkoren, The price impact of order book events: market orders, limit orders and cancelations, 12 *Quantitative Finance* 9, 1395-1419 (2012); Nikolaus Hautsch & Ruihong Huang, The market impact of a limit order, 36 *Journal of Econ. Dynamics & Control*, 501-22 (2012).

[29] *See United States v. Coscia*, 866 F.3d 782, 801 n.84 (7th Cir. 2017).

162.    But now futures trading, including CBOT Treasury Futures trading, is anonymous and confidential. Defendants took advantage of this anonymity and confidentiality.

163.    Orders that appear in the order book are not visibly associated with any particular market participant or trader. Only the market participant, the clearing firm or other entity through which it placed the orders, and the exchange knows whether it is placing manipulative orders.

164.    The clearing firm and the exchange are bound by confidentiality agreements and will not voluntarily disclose this information.

165.    If the manipulator does not reveal its spoof orders publicly, they will be unknown to the public.

166.    The information necessary to determine the scope of spoofing misconduct is readily accessible to the investigated entity and the exchange.

167.    Accordingly, Plaintiff will be able to ascertain the full extent of Defendants' spoofing misconduct in Treasury Futures and Treasury Securities only after they are given complete access to Defendants' trading data concerning these instruments.

## CLASS ACTION ALLEGATIONS

168.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. The "Class" is defined as:

> All persons or entities who transacted in Treasury Futures or Options on Treasury Futures traded on the Chicago Board of Trade from October 2014 through February 2021 (the "Class Period").

169.    Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded

from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

170.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury Futures and Options on Treasury Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

171.    Plaintiff's claims are typical of the claims of other Class members. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein. No conflict between Plaintiff and the Class members exists.

172.    Plaintiff will fairly and adequately protect the Class's interests. Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex class actions involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

173.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members include, but are not limited to:

a.   whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated prices of Treasury Securities, Treasury Futures, and Options on Treasury Futures;

b.   the nature and duration of Defendants' manipulation of Treasury Securities, Treasury Futures, and Options on Treasury Futures prices;

c.   whether Defendants' conduct violated Section 22 of the CEA;

d.   whether Defendants' unlawful conduct caused Plaintiff and the Class to suffer damages;

e.   whether Defendants were unjustly enriched at the expense of Plaintiff and the Class;

f.   whether Defendants fraudulently concealed their misconduct from Plaintiff and the Class; and

g.   the appropriate class-wide measure of relief for Defendants' CEA violations.

174.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

175. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

176. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

177. Any and all applicable statutes of limitations are tolled.

178. The nature of spoofing necessarily made Defendants' manipulation self-concealing.

179. During the Class Period, Defendants actively, fraudulently, and effectively concealed their manipulation of the U.S. Treasury markets.

180. Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Treasury Futures and Treasury Securities at a certain price, even though they secretly had no intention to transact at that level. Never did Defendants disclose that they placed these orders to manipulate the prices of Treasury Futures and Treasury Securities. Because of such active and purposeful concealment, and the fact that Defendants' manipulation is inherently deceptive and self-concealing, Plaintiff and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

181. Because Treasury Futures are traded exclusively on anonymous exchanges, it is impossible for Plaintiff to ascertain, without discovery, the identity of other market participants.

182. Defendants' code of conduct represented that their operations were above board, providing a false sense of security to unwitting investors. The Bank of America Securities Code of Conduct states: "Our culture reflects our commitment to act responsibly, manage risk well and

work honestly, ethically and in compliance with our Code, company policies and applicable laws, rules, regulations."[30]

183.    Despite all the above ostensibly requiring Defendants to detect and report market manipulation, during the Class Period, there were no public disclosures by Defendants, or any other entity, that Defendants had engaged in the illegal conduct alleged herein.

184.    Even industry analysts have stated that, despite being the party with all the pertinent trading records to uncover such illicit conduct by their traders, banks themselves have struggled to be able to properly identify spoofing internally.[31]

185.    As a result, Plaintiff and the Class had no knowledge or ability to be on notice of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before November 29, 2023, when FINRA announced that BofA Securities, Inc. consented to a $24 million fine relating to the same misconduct alleged here.

186.    As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and the Class.

187.    Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

---

[30] Bank of America 2024 Code of Conduct at 5, available at: https://d1io3yog0oux5.cloudfront.net/_ebcf8917059ff86ff1f542ba300b38b6/bankofamerica/files/pages/corporate-governance/governance-library/code-of-conduct/2024_Code_of_Conduct_%28English%29.pdf.

[31] *See* Dylan Tokar, *Spoofing Settlements Highlight the Foibles of Trader-Surveillance Tools*, THE WALL STREET JOURNAL (Oct. 9, 2020), available at: https://www.wsj.com/articles/spoofing-settlements-highlight-the-foibles-of-trader-surveillance-tools-11602275265.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Treasury Futures and Options on Treasury Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.* and Regulation 180.2)**
**(Against All Defendants)**

188.    Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

189.    During the Class Period, Defendants intended to and did cause unlawful and artificial prices of Treasury Futures and Options on Treasury Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of manipulative buy and sell orders and other manipulative conduct.

190.    Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of a registered entity, in violation of the CEA.

191.    During the Class Period, prices of Treasury Futures and Options on Treasury Futures did not result from legitimate market information and the forces of supply and demand. Instead, prices of Treasury Futures and Options on Treasury Futures were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

192.    Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution. Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Treasury Futures.

193.    Defendants manipulated the prices of Treasury Futures and Options on Treasury Futures throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold at artificially inflated or deflated prices.

194.    Defendants had the ability to cause and did cause artificial prices of Treasury Futures. Defendants, either directly and/or through their employees and/or affiliates, were active in the market for Treasury Futures and were aware of the effects of spoofing and other manipulative trading activities on the U.S. Treasury markets.

195.    By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

196.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures and Options on Treasury Futures, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

197.    Plaintiff and the Class are each entitled to actual damages sustained in Treasury Futures for the CEA violations alleged herein.

### SECOND CLAIM FOR RELIEF
**For Employing a Manipulative and Deceptive Device In**
**Violation of The Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**(Against All Defendants)**

198.    Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

199.    Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury

Futures and Options on Treasury Futures, constitutes the employment of a manipulative and deceptive device.

200.    Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class. The risk that Defendants' spoof orders and other manipulative trading activities could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Defendants' spoof orders and other manipulative trading activities were so obvious that Defendants must have been aware of it.

201.    Defendants knew that their spoof orders would appear in the order book and that traders often consider order book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

202.    Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

203.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures and Options on Treasury Futures, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

204.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**Vicarious Liability in Violation of the**
**Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.*)**
**(Against All Defendants)**

205.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

206.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

207.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

208.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

209.     Defendants financially benefited from their unlawful acts. As alleged herein, Defendants submitted spoof orders to the secondary market for Treasury Securities through electronic trading platforms and employed other techniques to manipulate the prices of Treasury Futures and Options on Treasury Futures in an artificial direction. Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiff's and the Class's expense.

210.     It would be inequitable for Defendants to be allowed to retain the benefits that Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiff's and the Class's expense.

211.    Plaintiff and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

212.    In addition, each Defendant should pay restitution for its own unjust enrichment to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiff as the Class representative and Kirby McInerney LLP and Lowey Dannenberg, P.C. as Class Counsel;

(B)    For a judgment awarding Plaintiff and the Class actual and punitive damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)    For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

Dated: February 13, 2024

KIRBY McINERNEY LLP

*/s/ Anthony F. Fata*
Anthony F. Fata
Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: (312) 767-5180
Email: afata@kmllp.com
amaneiro@kmllp.com

Vincent Briganti (*pro hac vice forthcoming*)
Raymond P. Girnys (*pro hac vice forthcoming*)
Peter Demato (*pro hac vice forthcoming*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Email: vbriganti@lowey.com
rgirnys@lowey.com
pdemato@lowey.com


*Counsel for Plaintiff and the Proposed Class*